IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 6, 2009

## CHARLES GREEN v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Gibson County**
**No. 17395    Clayburn Peeples, Judge**

**No. W2008-01183-CCA-R3-PC  - Filed June 19, 2009**

The petitioner, Charles Green, appeals the judgment of the Gibson County Circuit Court denying post-conviction relief.  On appeal, the petitioner argues that he received the ineffective assistance of counsel which caused him to enter an unknowing and involuntary guilty plea.  Following our review of the record and the parties' briefs, we affirm the judgment of the court denying post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Barbara Hobock and Cynthia Chandler-Snell, Humboldt, Tennessee, for the appellant, Charles Green.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Garry G. Brown, District Attorney General; and Jeffrey L. Long and Larry Hardister, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**BACKGROUND**

The petitioner was indicted on charges of aggravated kidnapping, a Class B felony, and aggravated assault, a Class C felony.  Pursuant to a plea agreement, the petitioner pled guilty to kidnapping and aggravated assault and received sentences of twelve years to be served concurrently.  At the guilty plea hearing, the state recited the factual basis underlying the petitioner's pleas:

> [T]he victim in this case was [the petitioner's] wife and this . . . went on for three days.  It actually occurred in November of 2005.  She alleged that [the petitioner] had called her to go to Arkansas to pick him up where he had been arrested.  He began to beat on her on the way back home; that he ultimately tied her to a bed, kept her

there for three days and beat on her in various ways, including the use of a cane to beat on her. This went on for three days and it included tying her with a belt around her neck. She was pregnant at the time. He was charged with both aggravated kidnapping and aggravated assault as a result of this.

As part of the plea agreement, the petitioner agreed to be sentenced as a Range III offender with 45% service requirement before being eligible for parole.

On October 26, 2007, the petitioner filed a pro se petition for post-conviction relief. After the petition was amended with the assistance of counsel, an evidentiary hearing was held on May 27 - 28, 2008. At the hearing, Tom Crider, an attorney with the Public Defender's Office, testified that he only had "general knowledge" of the petitioner's case, and that Linda Moore was primarily responsible for the case. Attorney Crider recalled that he met with the petitioner one or two times but did not conduct any of the plea negotiations on the petitioner's behalf.

Attorney Crider said that he did not talk to the victim, Jayla Green, but was aware that the victim had a previous conviction for misdemeanor perjury. Attorney Crider acknowledged that the victim's perjury conviction weakened her credibility as a state witness in the case against the petitioner. However, Attorney Crider noted that the victim's perjury conviction was also potentially damaging to the petitioner's defense. Attorney Crider recounted that the victim had perjured herself at a custody hearing by changing her story regarding a beating she got from the petitioner. She had lied about not being beaten by the petitioner then later changed her story.[1] Attorney Crider explained:

> [W]hy [Mrs. Green] was on probation for perjury was equally [] damaging, if not more so, in the context of what Mr. Green was being charged with. In other words, we thought the jury might well look at the fact that she had been intimidated, or at least said she had been intimidated, by Mr. Green before [and] . . . [t]hat might be taken against him by that jury.

Attorney Crider further noted that the defense was worried about opening the door to information about a situation where the petitioner had chained two minors to the front porch and whipped them with a bullwhip. Attorney Crider acknowledged that the victim admitted to using methamphetamine while pregnant and this admission could have been used to discredit her testimony had the case gone to trial. However, Attorney Crider reiterated that impeaching the victim posed a negative impact on the petitioner because the victim was married to the petitioner and it was not "a very pleasant situation."

Attorney Crider testified that Marty Burke, an investigator with the Public Defender's Office, did much of the "foot work," investigating the leads connected to the petitioner's case. Attorney

---

[1] The record includes a transcript of the petitioner's probation violation hearing wherein the victim explained in her own words why she perjured herself in the past. She said, "I lied . . . I said he did not beat me so when we went home he wouldn't beat me."

Crider recalled that he had over a dozen conversations with Investigator Burke regarding the petitioner's case. Attorney Crider denied that the victim was the only witness who would have testified against the petitioner if the case had gone to trial. Attorney Crider recalled that there was another witness, Frances Richardson, who would have corroborated "at least in part, some of what [the victim] had to say." Attorney Crider said that the Public Defender's Office did not issue a subpoena for that witness. Attorney Crider stated that the petitioner was looking at a "substantial sentence" if a jury convicted him. Attorney Crider speculated that the jury would have convicted the petitioner of the charges had the case gone to trial.

Linda Moore testified that she represented the petitioner along with Attorney Crider in the Public Defender's Office. Attorney Moore said that she did a lot of preliminary work on the petitioner's case. When asked, Attorney Moore could not recall if any letters were sent to the petitioner regarding the investigation of his case. However, she recalled that she talked to the petitioner on the phone a number of times. She also noted that she met with the petitioner three to five times prior to the entry of the guilty plea. Attorney Moore further noted that Investigator Burke was "heavily involved" in the case and personally met with the petitioner more often than Attorney "Crider or I."

Attorney Moore testified that she was primarily responsible for the plea negotiations with the District Attorney's Office. She recounted that "it was a major concession when the District Attorney's Office agreed to drop the aggravated kidnapping to kidnapping." However, as part of the concession, the petitioner was to be sentenced as a Range III offender even though he qualified as a Range II offender. Attorney Moore explained the reason for the increase in range classification was that the petitioner no longer faced the aggravated kidnapping charge which required 100% service of the sentence if convicted. Attorney Moore recalled that she discussed with the petitioner the advantages and disadvantages of pleading outside the range as required by the plea offer.

Attorney Moore acknowledged that she never spoke with Jayla Green, Frances Richardson, or Daniel Richardson, potential witnesses in the case. She explained that the investigation of the case against the petitioner was primarily left to Investigator Burke. She asserted that Investigator Burke had "lots and lots of training as an investigator and he [did] a much better job than any of the lawyers" in her office. Attorney Moore also acknowledged that she relied on the information garnered by Investigator Burke's findings. She relied on this information, including interviews with the potential witnesses, to assess the case against the petitioner. Attorney Moore could not recall if the state had subpoenaed Frances Richardson. Attorney Moore said she was aware of the victim's perjury conviction but could not recall how she became aware of it. She could not recall if anyone had obtained a certified copy of the perjury conviction in preparation for trial. Attorney Moore did not know if anyone from the Public Defender's Office subpoenaed Daniel Richardson who was allegedly present in the vehicle when the petitioner and the victim traveled back from Arkansas. She also could not recall if the petitioner received a copy of the indictment.

Attorney Moore stated that, if the case had gone to trial, she would not have brought up the victim's perjury conviction to impeach the victim. Attorney Moore explained that she believed the victim would have told the jury that she lied "because if she hadn't lied [the petitioner] was going to beat her up again." Therefore, the impeachment of the victim's testimony based on the perjury

conviction would be more harmful than helpful to the petitioner's case. Attorney Moore recalled that the District Attorney's Office had pictures of the victim. She explained that the pictures were pretty graphic and, if admitted at trial, they would have impacted the jury. Attorney Moore stated that the petitioner gave no indication of mental illness; and therefore, she did not see a need for a forensic examination of the petitioner.

Attorney Moore recalled that she advised the petitioner of the range of punishment he faced if convicted of the charges in the indictment. She stated that the petitioner understood the possible punishment he faced and that the decision to plead guilty was his decision. Attorney Moore asserted that every lead or issue brought to her attention was pursued by Investigator Burke and he would conference with her and Attorney Crider during the investigation.

Marty Burke testified that he worked as an investigator for the Public Defender's Office. Investigator Burke recalled that Attorney Crider requested that he investigate the petitioner's case. Investigator Burke stated that he interviewed Frances Richardson on September 6, 2006. She told him that the victim came to her and told her that she was leaving the petitioner because he beat her. Ms. Richardson told Investigator Burke that she saw bruises and swelling on the victim's left side and chest area. Investigator Burke recounted that he could not locate Daniel Richardson, an alleged witness to some of the beatings that took place during the trip from Arkansas. Investigator Burke acknowledged that he was probably the primary contact the petitioner had with the Public Defender's Office. Investigator Burke asserted that he reported the information discovered from the investigation to Attorney Crider and Attorney Moore.

Investigator Burke acknowledged that he probably discussed the plea offer with the petitioner. Investigator Burke stated that he generally used a chart taken from the Tennessee Code Annotated to help explain the range classification and release eligibility for any given plea offer. Investigator Burke said that he never questioned the petitioner's mental stability even though the petitioner alleged that certain people in Perry County conspired to get him. Investigator Burke said that it was true that certain people in Perry County did not like the petitioner.

The petitioner testified that he was incarcerated for about nine months before he entered his guilty pleas. According to the petitioner, Investigator Burke was his primary contact with the Public Defender's Office. Investigator Burke met with him several times for the first month or two. As the investigation progressed, Investigator Burke met with him about once a week. The petitioner would give Investigator Burke information and leads and Investigator Burke would investigate. However, as his trial date approached, the petitioner did not hear from the Public Defender's Office and he felt like he was "in a void for a long time."

The petitioner claimed that the only charge against him in General Sessions was for aggravated assault. He stated that he never received a copy of the indictment from the grand jury. He recalled that Investigator Burke told him that he was facing charges of especially aggravated assault and especially aggravated kidnapping. When the petitioner asked him what kind of sentence those charges carried, Investigator Burke told the petitioner to talk to his attorney. The petitioner said he figured out from talking to other inmates that the charges carried a sentence of 20 to 30 years

with no possibility of parole. The petitioner said he was 40 years old at that time and the thought of spending that much time in jail "scare[d] the heck" out of him.

The petitioner alleged that Attorney Crider and Attorney Moore came to him on the Thursday or Friday before his trial date on Tuesday, November 7th. They relayed the state's plea offer of 12 years at 30% to run consecutive to his Perry County conviction for a total effective sentence of 20 years. The petitioner said he would consider the offer if they could get the state to agree to a concurrent sentence. On the day before the trial date, Attorney Moore came to him with an offer of a concurrent sentence. However, she told him that they were still negotiating the percentage of service. The petitioner claimed that Attorney Moore never told him whether he was a Range I, II, or III offender. He said he saw the 45% service requirement, but he did not understand that he was agreeing to a sentence outside of his range even though he told the trial court that he understood.

The petitioner asserted that the victim lied under oath because she was deceitful and not because she was afraid he was going to beat her up. He claimed that there were several people who saw the victim in town on the days she claimed to have been held captive. He gave the names of those people to Investigator Burke. The petitioner acknowledged that Investigator Burke talked to several of those people.

On cross-examination, the petitioner admitted that he had gone through the process of pleading guilty on previous charges. In the past, he had pled guilty to possession of drugs in Montana. He had also pled guilty to three felonies in Perry County. He acknowledged that the felonies were based on charges that he beat his wife, Jayla Green, and his nephews, who were ten and twelve years old. A copy of the petitioner's plea acceptance form was introduced as an exhibit at trial.

## II. ANALYSIS

On appeal, the petitioner argues that he received the ineffective assistance of counsel which caused him to enter an unknowing and involuntary guilty plea. In making this argument, the petitioner essentially asserts that his attorneys were not prepared to go to trial and that their lack of preparation placed him into a position of pleading guilty without a "real understanding" that he was pleading "outside the range."

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). On appeal, this court is bound to the post-conviction court's findings of fact unless the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings is de novo with a presumption that the findings are correct. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001). Our review of the post-conviction court's legal conclusions and application of law to facts is de novo without a presumption of correctness. *Id.*

When determining the knowing and voluntary nature of the guilty plea, the standard is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970); *see also State v.*

*Pettus*, 986 S.W.2d 540, 542 (Tenn. 1999). The reviewing court must look to various circumstantial factors, including:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). A petitioner's solemn declaration in open court that his or her plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

To establish the ineffective assistance of counsel, the petitioner bears the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). A fair assessment of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). Once the petitioner proves that counsel's representation fell below a reasonable standard, the petitioner must also prove prejudice. *Strickland*, 466 U.S. at 694. In relation to a guilty plea, the petitioner must show a reasonable probability that, but for the errors of his counsel, he would not have pled guilty and would have insisted on going to trial. *See Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *Adkins v. State*, 911 S.W.2d 334, 349 (Tenn. Crim. App. 1994).

In denying post-conviction relief, the post-conviction court made the following findings pertinent to the petitioner's claim on appeal. The court stated:

> I find that the representation by the Public Defender's Office was not insufficient. I find that while the work done by various members of the Public Defender's Office was not articulated with any specificity . . . I think that when you take the testimony of Mr. Crider, Ms. Moore and Mr. Burke as a whole, it does indicate that a significant amount of work was done on this case . . . . I do think that they did a sufficient amount of work, they, the [Public Defender's] office, in order

[for the petitioner] to make a competent decision regarding whether or not it was in his best interest to enter the plea that he did.

I believe from what I have seen of the evidence that it was probably in his best interest to do so. . . . It seems clear from Ms. Moore's testimony that she did not coerce the [petitioner] into pleading guilty. His testimony today is that he essentially pled guilty because he knew that the Public Defender's Office had not done enough work on the case in order for him to prevail.

. . . .

I don't know what to do about the problem of how many times an attorney has to meet with his or her client . . . . [I]t's impossible from the testimony in this case to quantify what amount of time the Public Defender's Office spent with the [petitioner]. The Court does, however, find that it was adequate to apprise him as to his possibilities and options should he go to trial. The Court finds that the Public Defender's Office met the minimum standards that have set out by the Courts of this State with regard to representation by criminal defense attorney.

The record does not preponderate against the post-conviction court's findings. The record reflects that the petitioner's case was investigated and the petitioner was apprised of the strengths and weaknesses of the state's case against him. As a Range II offender, the petitioner faced a range of punishment of 12 to 20 years for aggravated kidnapping to be served at 100% and 6 to 10 years for aggravated assault. *See generally* Tenn. Code Ann. § 40-35-112(b). The petitioner also faced the possibility of having to serve his sentences consecutively. The record shows that the petitioner's attorneys negotiated a favorable plea agreement and explained to the petitioner the nature and consequences of the guilty plea, including the consequences of pleading as a Range III offender. By pleading guilty as a Range III offender, the petitioner received sentences of 12 years to be served concurrent with each other and with another sentence from Perry County. The plea acceptance form, signed by the petitioner, clearly states the petitioner's release eligibility status of 45% as a Range III offender. Also, the guilty plea hearing transcript shows that the petitioner read the plea acceptance form and was afforded time to consult with his attorneys about the details of the plea. Additionally, the trial court asked the petitioner if he understood he was pleading outside his range, explaining: "And what being a Range Three Offender means is that you would not be eligible for any sort of parole consideration until you had served at least 45 percent of your sentence." The petitioner responded affirmatively that he understood. In sum, the petitioner is not entitled to relief as the petitioner did not prove he entered an unknowing or involuntary guilty plea as the result of ineffective assistance of counsel.

## CONCLUSION

Based on the appellate record and the foregoing reasoning, we affirm the judgment of the post-conviction court.

_____
J.C. McLIN, JUDGE